The final case is 24-1900, Doe v. Mast. Mr. Moran. Good morning, Your Honors. Chief Judge Diaz, Judge King, and Judge Richardson. May it please the Court. John Moran of McGuire Woods. On behalf of Appellants, I've asked to reserve five minutes for rebuttal. Under the First Amendment, a court may not impose a prior restraint on a litigant's extrajudicial statements without satisfying strict scrutiny. That is, without determining that the speech restriction is necessary and narrowly tailored to serve a compelling government interest. The District Court erred in refusing to lift the ex parte speech restrictions at issue based on that Court's conclusion that plaintiffs could sue pseudonymously under the standard this Court articulated in James v. Jacobson. The Court should therefore reverse the decision below and remand with instructions for the District Court to vacate the portion of the ex parte protective order that restricts the Mast and their attorneys and agents from, quote, disclosing any information that directly or indirectly identifies plaintiffs or their family members to any person. Now, I know we have a lot of ground to cover, including some jurisdictional issues that were carried over from a motion to dismiss. There are three points that I would like to emphasize today during my argument, two that are legal and one that's factual. What's your best argument for jurisdiction? So, Your Honor, as the Sixth Circuit recognized in Ford, there are three different ways that courts of appeals have exercised jurisdiction to review. We think the best one, the most straightforward, is under 28 U.S.C. 1292a1. This is an appeal of an order refusing to dissolve an injunction. As the Second Circuit has held that a protective order, to the extent that it purports to restrict a litigant's out-of-court statements, is in the nature of an injunction, and therefore an order refusing to dissolve that portion of the protective order would be appealable under 1292a1. Other courts have exercised review under the Cohen Collateral Order Doctrine or, alternatively, under a writ of mandamus. We think any of those avenues could get the court to appellate jurisdiction, but we think 1292a1 is the correct one and the most straightforward. If I may, the two legal points are, one, that there's a critical material difference between a court's order... I'm sorry to interrupt you, but before you get to that, even if we agree with you that there's a path toward jurisdiction in this case via the Collateral Order Doctrine, why is the appeal timely in this case? So, Your Honor, the question, if you're proceeding specifically under the Collateral Order Doctrine... I know you have another option. You say mandamus gets you there, but let's assume that that doesn't work. I mean, the order was entered long before any other judgment was entered in this case, right? So why wasn't it appealed then? So I think, Your Honor, whether you're looking at it under 1292a1 or under Cohen, the Collateral Order Doctrine, the question is, what is the order being appealed from? We agree that this is not a timely appeal of the September 2022 ex parte protective order. That was the original protective order that was entered in this case. It was entered before we were even served with the complaint. And so we acknowledge that there is not a timely appeal of that particular order. But you were in the case soon after that. We were in the case soon after that. The basic timeline is that... But you know what the provisions were of the 2022 order. But your notice of appeal is in 2024. Yes, Your Honor. So if I can unpack that a little bit, I think part of our argument is that we would take issue with knowing the material terms of the order. So the order, as I quoted, it prohibited the parties, including the mass, from disclosing any information that would directly or indirectly identify the plaintiff. The precise contours of that and how the district court understood that order and applied that order played out over time. The specific timing is that the complaint was filed and the ex parte protective order was obtained on September 13th, 2022. The mass were then served a week later on September 20th, 2022. At that time, we agree they did not appeal, immediately appeal the ex parte protective order. We submit that's based in part on the fact that they didn't understand and had no basis to understand the way that the court would interpret that order and apply it to restrict their out-of-court statements. In particular, following that, on October 20th, which was more than 30 days after the ex parte protective order, so after, if the clock were truly running 30 days from the order, after the order had run, the Associated Press ran a story that included on-the-record interviews, that was based on on-the-record interviews from plaintiffs and from their counsel. Further stories were issued and published in November of 2022 and December of 2022. Then in January 2023, the mass came to the district court and said, we are seeking to lift the protective order. We think that it should not have been issued when it was issued, but we also think that even if it were properly issued when it was issued, that there have been material changes in fact, that the mere fact that the plaintiffs have given interviews to the media, both directly and through their counsel, undermines their claim that they are at risk of having their identity disclosed and that they need a coercive judicial order to restrict the mass ability to speak and identify them either directly or indirectly. And so that was the time when we sought to lift the order. It was then over a year and a half later before Judge Moon ruled on the order, which he had by that point combined with two contempt motions that plaintiffs had filed in the intervening year and a half. So we agree that we did not file a timely appeal within 30 days of the September 2022 order. I respectfully submit the court should consider that if it were to hold that that was what we were required to do, then the court might see a lot of premature appeals. But it's also fair to say that you can't now raise, and this is perhaps why you have not raised, arguments with respect to the irregularities with that order. So that order was issued ex parte. We don't typically allow prior restraints to be issued ex parte, but that's a procedural issue that you now can't raise because that's not a problem with respect to the order that you've appealed. Correct, Your Honor. We acknowledge that our appeal now lives and dies with the issues that are encompassed within the scope of the August 2024 order. We think the key point, plaintiffs cite a few cases, including the FTC case, that stand for the proposition that when a later order merely sort of executes on or reaffirms an earlier order, that they effectively merge together. So there is no later order that can be appealed independently of the first order. And we think that doctrine simply doesn't apply here because it's a different holding. It involves a definition and expansion of the material terms of the protective order. And probably most fundamentally, it was decided on a different factual record than the ex parte order that was entered in September 2022. If the court— No. I'm of course happy to answer the question. Give me the three points you want to make quickly because then I've got a different question. So the two legal points are these. One, there's a critical legal difference between a court's authorization of pseudonymous litigation, which fundamentally implicates the court's control of its own docket and the judicial machinery on the one hand, and a court's order restricting the out-of-court statements made by a litigant, which implicate fundamental free speech protections that belong to those litigants. So we fundamentally reject, and we don't think there's any precedent supporting, plaintiff's contention that a speech restriction, a gag order, however you want to characterize it, that a limitation on out-of-court statements is a necessary corollary of authorizing pseudonymous litigation. The second point is similar, that there's a critical difference between a court's restricting the disclosure of information that a litigant obtains through the judicial process. So, for example, discovery that's produced under a judicial protective order or disclosure of the contents of a sealed filing on the one hand, and on the other hand, a court's restriction on the disclosure of information that a litigant possesses independent of the judicial process. And it's undisputed that the content of the communications that are now clearly construed by plaintiffs and were construed by the district court in the August 2024 order, the content of the statements that was construed to be impermissible identification, was all information that was known to the mass well before this litigation was ever filed. And that leads to the third factual point. It's the unusual and remarkable context in which this arises here, where at the same time that the plaintiffs were seeking an order authorizing them to proceed under pseudonyms and to restrict their disclosure, they were giving one. You're talking about in 2022. Yes, sir, in 2022. Okay. At the same time that they were seeking the protection of pseudonymous litigation and a restriction on the mass out-of-court statements. Which was immediately on filing the complaint. Yes, Your Honor. The ex parte protective order was sought contemporaneously with the plaintiff. That's when you do that. When you file a complaint, you want to proceed as a doe. That's what that, if you're going to proceed as a doe, you've got to get it protected immediately. Yes, Your Honor. We're not challenging. That's the way it works. Yeah, but you're talking about it now. I mean, you're giving us the background of it. Go ahead. Okay. We consider it, I personally consider it remarkable in my experience, to have an order restricting out-of-court statements in a context where the very party that sought those restrictions is giving media interviews in order to further a public media scrutiny of their case that is designed to tell public information.  I can't hold back anymore. All right. So I gave you all. Understood. All right. So you sort of start with this premise that prior restraints, except hypothetically that I believe this is a prior restraint, you start with the premise that prior restraints are subject only to strict scrutiny. And I read the case law from the Supreme Court to say that prior restraints are actually more restrictive than strict scrutiny, that in fact they have a more searching inquiry, and that they're a set of, as the Supreme Court says, narrowly defined exceptions for which we permit prior restraints. So it's not some freewheeling strict scrutiny to the extent we call strict scrutiny freewheeling. It's actually more limited than that, right? That in fact the Supreme Court has identified only four grounds that will permit a prior restraint. We can talk about obscenity, but the point being, do you agree that those cases like Southeast Promotions and the like limit what we're doing? Like if it's about a fair trial, then you do strict scrutiny. If it's about national security, then you do strict scrutiny. If it's about obscenity, then you do strict scrutiny. But we have to go through that threshold question first. Well, if I understand the court's question, then the point would be that other prior restraints outside of those categories would just be categorically unconstitutional, and even a finding of strict scrutiny wouldn't justify them. I mean, we would certainly welcome that rule. I think reading Murphy-Brown, we— Well, but Murphy-Brown—so Murphy-Brown's easy, right? Because Murphy-Brown is one of the very exceptions the court has identified, right? Because the right to a fair trial is one of the four narrow exceptions that the Supreme Court has recognized that permit these types of prior restraints. So of course it makes sense for Murphy-Brown to do strict scrutiny because it falls within one of the four exceptions, right? But Southeast Promotion says that it must fall with one of these narrowly defined exceptions, and there are four of them. Now, this case might fall into one of them, too. I can have that discussion. But at this threshold question, I guess I wonder why we're not running it through that lens first. And then when we get to strict scrutiny, we might have the same kinds of arguments. Yes, Your Honor. I mean, we made a choice not to argue that if there were a genuine concern about the protection and safety of the plaintiffs and their family, and we don't think they've ever been put to the factual test. We proffered evidence that would have rebutted their evidence and weren't afforded the opportunity to put it on, and we'd be happy for that opportunity to do so. So we've chosen not to contest that that could justify a restriction. If it satisfied strict scrutiny, that may not be the right doctrinal answer at the end of the day. And that's what Judge Moon relied on. Yes, Your Honor. That's the basis of Judge Moon's. The interest that he's justified the order was to protect the plaintiffs and their family. We think, for what it's worth, that's another example that distinguishes the September 2022 order from the August 2024 order, which is that one of the stated bases for seeking the order in 2022 was the plaintiffs' concern that if and when they returned to Afghanistan, that they would be subjected to harassment and threats based on their participation in this litigation. In the interim, plaintiffs obtained asylum and have disavowed any intention ever to return to Afghanistan. And so that factual basis, which was part and parcel of the September 2022 order, did not exist at the time of the August 2024 order. Let me ask you a question about the nature of this order and specifically how is this order, which essentially limits, which does limit your client's ability to, you know, remove the pseudonyms that otherwise would apply to these particular parties, any different from a traditional protective order involving confidential information and, for example, a trade secrets case? Sure, Your Honor. I see I'm running low on time. The fundamental distinction is that this is a restriction on the disclosure of information that was not obtained through litigation. And so Professor Volokh talks about this in the article that we cite in our brief, and we think it's borne out in distinguishing some of the cases that plaintiffs— Why does that matter legally? It matters legally because we think it's okay under the First Amendment for the court to say that we're going to condition a litigant's access to information that it's obtaining through the judicial process on an agreement as to how it's going to use that information. So the court can say, just like a private party could say, I'm willing to tell you something, but you first have to agree that you're not going to use it for X, Y, and Z purposes. And so the court can say, we're going to coerce the other side to turn over these documents to you, but you have to agree that you're going to use them only for purposes of this litigation. What the court doesn't have the authority to do is say, we just met these plaintiffs yesterday. We understand that you have this long-running factual dispute that's playing out in the media, and we're going to stop it now. We're going to let them continue talking, but we're not going to let you talk anymore. Well, that's a little bit unfair, right? You can talk all you want about it. Your clients were free to talk all they wanted to about the merits of the case. They just couldn't identify these particular parties in the context of whatever interviews or statements they wished to make. Well, with respect, Your Honor, we think that the identity of the parties is inextricably wrapped up in the merits of this case. It is fundamentally a dispute about their claim to be familiar relations of the child, which is a factually hotly contested and disputed issue. Not in this court, though, I guess. Not in this court. This is an ancillary issue, which is why we think Cohen is one of the available doctrines under which this court could exercise jurisdiction. All right. Thank you very much. Mr. Ellicott, could you start with that last point about your colleague's view that this is somehow fundamentally different than a traditional protective order in a civil case? You might disagree with that. If so, tell me why. Thank you. May it please the Court. Kevin Ellicott on behalf of John and Jane Doe. We do disagree with that point, Judge Diaz. We pointed the court in the briefs, and the masks notably don't mention at all the Seattle Times case from the Supreme Court, which dealt with whether First Amendment scrutiny applies to a protective order that has the effect of restraining speech. But involved exactly, as your colleague just explained, like information that was obtained during the course of litigation. Like if Mr. Moran was going to cite a case to prove his point, I thought he was going to tell us Seattle Times. Sure. And he didn't. But I would say I have two responses to that. The first is, as I think Judge Diaz hypothetical earlier about trade secrets, is a good example. I think it's not always the case that a protective order that may be lawfully entered can only apply to information that's gained during the course of litigation. But nobody's saying it's only, right? The question is, is there a prior restraint, and you've got to satisfy straight scrutiny. Nobody's saying that you can never do it, right? The question is, what is the test, right? And Seattle Times tells us it's like a good cause test, where it's information that's inside of the discovery process, because indeed the government has compelled, through the judicial process, you to turn that information over. But where it's not, where that information is instead sort of known independent of the judicial process, then that is like a fundamental prior restraint. Well, Your Honor, I think it's my second point. On the getting the information only pursuant to it having been part of the judicial process, what the protective order in this case actually prohibits is the disclosure of the plaintiff's identities, capital P, plaintiffs in this case. As Judge Moon mentioned in his decision below, the prohibition is on identifying plaintiffs as such, plaintiffs in this case. This is not a circumstance of prohibiting, hey. Okay, so your view is, and if you can see this, this is helpful, right? If the mass here went to the newspaper, like your clients did, and said, we are telling you, we are not talking about the litigation, but we adopted this baby, just purely factually, we adopted this baby, the baby's name is whatever the baby's name is, and this other couple named Jane and Bob, whoever they are, they took the baby from us. And we've made no comment with respect to any litigation, and we don't tell you that those are the people that are involved in the litigation. You would plainly show up and say that they violated this protective order. Well, Your Honor, I think we would because that to me strikes me as a wink, wink, nod, nod. We're not telling you who the plaintiffs are in this case. We're not talking about the litigation. But then you're doing is you're telling them that they cannot talk about facts that were known to them before your clients invoked the judicial process, before you came to federal court and said, federal court, give me relief. And in doing so, you're saying, this other group of people, they cannot talk about the things that occurred prior to that lawsuit, right? Because you have ordered that they can't use the names. And the names are obviously like part of the story. Well, Your Honor, I guess the question that I would ask on whether— I mean, when your clients told the story to the newspaper, they used their names. Well, Your Honor, our clients did give interviews on condition of anonymity, which was honored. Not anonymity of the other side, just your own anonymity. You say, please don't use my name, that's fine. But you go tell your story to the New York Times or whoever it was, which, you know, you've got at least without a protective order every right to do. But that seems like a hard line to draw is to tell us that they now can't talk about the things that occurred before the litigation even began. Your Honor, I fundamentally disagree with the characterization of they can't talk about the things that happened before the litigation. They're limited by it, so they're restrained from talking about parts of what happened. They can't use the names. Yes, to the extent you want to say names are part of what happened, they are restricted from identifying the plaintiffs. But they could have—I'll give you an example. They could have done everything that they did in the CBS Mornings interview or everything that they did in the event that Judge Moon actually found them in contempt on, which was to go off and do fundraising for the purpose of this litigation and to have his brother go be his agent, be on the One American News Network to talk about this case. Could have done all of those things. Just don't show an identifying photograph. I think that our case is fundamentally much more challenging in a potential contempt proceeding if they had just not shown the photograph. This is not a case about whether the masks can go and tell their side of the story, about whether they can go and raise money for a legal defense. It is simply about protecting the identities of our clients because Judge Moon made factual findings that are not challenged. What I'm trying to rub, though, is not whether that's a permissible thing to do. It might be. What I'm getting at is that this is, back to the Chief's question, this is a restraint on them talking about things that they know independent of the judicial process. And then we've got to ask, is that okay? And that that is a fundamentally different question than what Seattle Times tells us that relies on the trade secrets or information developed during the judicial proceeding. I totally understand, and you might well be right at the end of the day, I'm not actually fighting you on this, that you can establish a compelling interest and that you can establish narrow tailoring. That may well be true. My point is you can't say that it is Seattle Times because this is all information that was known to them before that they would have a First Amendment right to talk about without judicial intervention. Can I just follow up on that? Can you talk about whether or not in Seattle Times that requirement that the information is learned during litigation, was that an absolute condition or was that just a statement made in the course of the court's holding? I think that it was not stated as a condition of this rule only applies here, but I think it was they were deciding under the circumstances of that particular case. So Judge Richardson, I take your point. I understand. The language that Justice Powell wrote in Seattle Times mentions that it uses as justification that this is information. But that's not the complete set, I don't think, of examples where, you know, a protective order might be in order. That's correct. And that gets me back to the duplication. Yeah, I understand. The point I was making, in response to Judge Richardson, I said I had two points, and I got to my second point. The first point is, for example, in trade secrets litigation, Company 1 sues Company 2 for stealing a trade secret. Company 2 already knows what the alleged trade secret is before the litigation was filed. They didn't learn it by virtue of the litigation. But that doesn't mean that a protective order can't prohibit the parties from disclosing that information. Generally speaking, in a trade secret case, like, the other side doesn't know the actual, like, details of the trade secret, right? That's sort of the point. You don't know what the, you know, special sauce is. And that's where the protective order is over, is you learning about the special sauce. Well, I – Right? I mean, that's what – you get discovery, so you get to see the documents, the financial records, right? Whatever you want to say, it's not the things that you knew before. Well, Your Honor, there may be a dispute where Company 2 doesn't think it's a trade secret, right? And Company 1 wants to make sure that it is. I mean, like, you could have these circumstances where there's information both sides know that one has good reason to keep from being public in the course of litigation. Well, and if the other side chooses to publicize something that might be a trade secret, they may well bear the brunt of having done so. But if they knew it before, they have to – it seems like to me that, you know, our case in Murphy Brown, consistent with Seattle Times, they've got to establish strict scrutiny to do that. Well, and, Your Honor, I think that that brings me back to sort of the – early this morning in one of the earlier cases, you asked an advocate, what really matters? What are we talking about in this particular case? I don't think – I'm not suggesting that what you're pointing out doesn't matter. It's very important to – You are, but that's okay. No, no, no, no. No, no. What I want – I'm used to it. I can tell you. No, Judge, I genuinely – what I want to do is take a step back and say, here's something else that matters. Something else that matters is the effect of the argument that the masks are making, which is they're not challenging James v. Jacobson. They're not challenging John and Jane Doe's ability to be John and Jane Doe. They don't challenge Judge Moon's factual findings regarding the risk of harm to them or to their family members. I heard Mr. Moran say he didn't have an opportunity to present evidence. I think that's news to me if you look at the record at page JA160. Does the defendant plan on calling any witnesses? Mr. Moran, Your Honor, Joshua Mast and Jonathan Mast are here. We won't call them unless the court expresses an interest in hearing from them. Everyone had an opportunity to put evidence into the record. What I am trying to emphasize here is what they're insisting on is, notwithstanding a completely lawful and legitimate basis to be John and Jane Doe in court, the defendants have a right to go on the courthouse steps and tell everyone who John and Jane Doe is. That's not something that you can pull out logically from James v. Jacobson, from any of the Doe cases that this court has decided. Doe v. SIDAR was in 2024. None of those cases address that question. That's not what those cases are addressing. They're addressing the judicial process. Because when we put something on the web, we are putting it out there. That's the court system putting it out there. And our right to speak looks very different. But the access to that is a different calculus. But this is a private party who's being told prior restraint on their speech about things that they otherwise knew. Those are not the questions that are coming up in the pseudonym litigation that we do have before us. Those are just fundamentally different questions under the First Amendment. And it looks to me an awful lot like Murphy Brown. We've got a prior restraint. It's a gag order. You might think gag orders are great. And listen, I've been involved in cases where they had them. And I think in those cases, particularly where there are high-profile issues, this right to protect a fair trial often will justify or at least sometimes will justify the use of these gag orders, particularly when they're narrowly focused on the lawyers or the parties that are involved. I totally get that. But that requires that extra step. It's not just the same as calling somebody Jane Doe. I understand the sentiment, Judge. I understand Murphy Brown very well. I wrote the briefs in that case, and our firm won that case. We are not in favor of gag orders. That's a fundamentally different case. I do want to – Help me understand that. Give me just your, like, three bullet points. I'm confident that you have them as to why you think this is not Murphy Brown. Well, because it's – the restriction is quite narrow. I think that the – Which restriction? The restriction in this case is quite narrow. If you look at the gag order in Murphy Brown – Okay, but why does – the extent of the restriction, right, might go to narrowly tailoring, right, but it doesn't affect whether it's a prior restraint, right? If I restrain you from saying one sentence or I restrain you from selling your book, like, it doesn't make a difference that I just took a little bit of your First Amendment right, right? I mean, that's not a distinction that we ever rely on in the First Amendment context, is it? No. Well, Your Honor, so then assuming, then, that we're going through the First Amendment strict scrutiny analysis, one of the ways this is fundamentally different from Murphy Brown is how that was a blanket catch-all restriction, no discussion about any of the case to any communications media directly, et cetera, et cetera, et cetera. Totally fair. I guess maybe I should be more precise. Why is this not like Murphy Brown for requiring that we do this strict scrutiny as a prior restraint? Your Honor, I think what I can tell you is our position is it's not like Murphy Brown because this is an order that's entered under the auspices of a protective order that, through the court's power to show good cause, to protect the parties, that good cause standard exists both at Rule 26, both Rule 5.2. But why didn't that same argument, then, prevail in Murphy Brown? Like, that's what I don't get. Like, if you're right about that, which maybe you are, then Murphy Brown's wrong. And, you know, our en bas court can do that. But what we can't do, and I totally understand your argument, right? Murphy Brown might have been wrong, right? But we're bound by it, right? I don't think Murphy Brown was wrong. But then tell me why Murphy Brown doesn't require that we do strict scrutiny. We might get to a totally different answer. Right. I understand those distinctions on the back end. I'll stop with this question, but just give me, if you have a reason why Murphy Brown doesn't require that we do the strict scrutiny, and, in other words, that the district court got its first holding totally wrong. Right. My reason is Seattle Times. This court in 2011 cited Seattle Times, ACLU v. Holder, saying, good cause under the federal rules of civil procedure does not require heightened First Amendment scrutiny. Can I ask you a question about Murphy Brown? Yes. So was there a fight about whether or not the information in that case amounted to a gag order, or was the fight about the scrutiny, whether strict scrutiny was overcome in that case? There was not. The fight in that case was about the necessity of the order. Right. So there was an assumption that it was a gag order. The only question was whether or not it was needed, right? Right. The issue in this case is whether or not you think the scope of this order rises to the level of that particular type of gag order in Murphy Brown. And, you know, that doesn't necessarily require us to overrule Murphy Brown, would it? No. Of course not. And just so I'm clear, will you tell me why in Murphy Brown we take it to be an assumption, not a holding, that this is a gag order? I mean, it describes it as a gag order, right? A gag order imposing stringent restrictions on participants in a series of suits. I mean, it seems like to me that's not an assumption. It could say, assuming this is a gag order, this is what we would do. But it actually says it is a gag order, and then it says it is then analyzed under strict scrutiny. Right. And I'm not disputing that that was the holding of that case. The question is whether this order in this case amounts to a gag order. That's right. And, Your Honor, I think I would say that there was no dispute in Murphy Brown about the characterization of the order as a gag order. And I guess I'll stop after this one, I promise. Can you tell me the reason why that was a gag order subject to strict scrutiny and this order is not? What distinguishes this order such that Murphy Brown doesn't require us to do strict scrutiny? And you've danced around that, but I'm still waiting on the answer to what about this order takes it outside of Murphy Brown? For the purpose of finding that we have to do strict scrutiny, we can talk all about how you meet strict scrutiny. I'm literally just trying to get the framework. Sure. And, Your Honor, I think that what we're talking about is a distinction between a gag order and a protective order. I don't mean that semantically, that the judge called it one and so it's not the other. But that's how the case laws describe them. Judge Wilkinson's opinion in Murphy Brown talks about gag orders and other cases involving gag orders. Is there any other reason than the name that's used to have a substantive distinction between what this order requires and what that order requires? Your Honor, it's through the court. I would say the gag order is entered pursuant to the court's inherent authority to control the proceedings in front of it. That's one distinction. Here, this was not subject to the court's inherent authority. This is subject to the rules that allow the court to provide protection. Rule 26, Rule 5.2, that's where the good cause standard comes from, and that's the hook to Seattle. But there's no difference. You haven't given a difference with respect. And I'll stop after this one, I promise. There is no distinction between what that gag order did or what that order did, forget its title, and what this order does with respect to the restraint on speech. It might have a different inherent authority. I don't understand what that even means. But whatever, I'll grant you everything you've said, but the effect of the order is the same with respect to the restriction on speech. I think for that, in this narrow issue here, yes, yes. If I could very briefly talk about the jurisdictional issues. The question was raised earlier about the timeliness issue, the suggestion that how could this have been appealed. I think Ms. Moran got the dates a little wrong. The masks appeared on September 20th. They were served on September 6th. But in all events, the Federal Rules of Civil Procedure say that a lack of notice doesn't extend the deadline for a notice of appeal. That's Federal Rule 77D2. By my read of the rules, I think they had two options. Option one, move after you've appeared, but while you're still within the notice of appeal time period, which they were when they showed up in court, ask Judge Moon to extend that deadline and by that 30 days, that's under Appellate Rule 4A5. During that time period, could have asked him. Can I ask a question? Is it your view that a court can enter an ex parte prior restraint? Is that something that a court is entitled to do? Well, no, Your Honor, but I don't want to go back around over and over again on prior restraint. They haven't challenged it because they didn't appeal that order. But it seems a little odd to say that the district court did something that I think we all sort of acknowledge was not procedurally proper. And they show up after the game and then now when they show up to challenge this and change circumstances, the argument is they needed to challenge this ex parte restraining order. We don't all agree that the judge did something procedurally improper. The only way they could do this ex parte. It's the only way that John and Jane Doe can be John and Jane Doe. The only way they can proceed pseudonymously, whether there's a prior restraint is a separate question. They're not challenging proceeding pseudonymously. They're just challenging the prior restraint. They're not the same. You acknowledge those are not the same. Well, Your Honor, I think that Judge Moon had a very salient point, which is that in many ways, what you're calling a prior restraint, what we're calling this protection of our client's identities, is a corollary to being pseudonymous in court. I understand you disagree. I understand. But that's our position on that particular issue. The question of there being new circumstances, they certainly didn't present evidence of new circumstances. Judge Moon made a point several times in his decision. Did they put in the newspaper articles about your client going and speaking? That information was in the record. That was new, right? It was in the record. The information, though, that the masks pointed to below, and Chief Judge, I see my time has expired. You can continue. So what they pointed to was the suggestion of the hardship that the protective order was imposing on them, and that was what Judge Moon said was speculative and underdeveloped. He said several times they have made arguments but have not put forward evidence. But regardless, Judge, even if they brought forward new evidence, the issue with that is from a jurisdictional, you know, timeliness of the appeal standpoint, is that suggesting that any time there's an order that settles some issue and then there's new evidence that comes up and the court just denies it because it says this evidence, this new evidence wasn't sufficient enough for me to change my mind, you're reopening the appeal clock. And that's not what is permitted. What you look at is did the second order alter or change the rights that the first order. On the second order, you mean the 2024 order? Yes. That's right. In the earlier one, you were talking about 2022. Yes. And they missed the timing. You say you're taking position in 2022, and that wasn't saved by the 2024. Yes, because the 2024 order doesn't do anything to change the rights or obligations of the parties. They recast it and call it an injunction, and then they start trying again or modifying an injunction for an interlocutory appeal. They said that's their best argument, that it's timely, that they have a timely notice of appeal. Your Honor, we think it's not an injunction. An injunction, to me, is an order that a court enters that's going to granting relief that's being sought on the merits of the case. That's why when you give an injunction, you're asking what's the likelihood of success on the merits. This is an issue that doesn't touch on the merits. The Gulfstream Aerospace from the Supreme Court says orders that relate only to conduct or progress of litigation before the court are not injunctions. I believe it was Judge Duncan wrote in the Lutz decision before this court, Congress did not envision that every interlocutory order restraining a party's actions. So your position is it's not an injunction. It is not. They also say, then, as a fallback position, it's a collateral order. They take an appeal under the collateral order doctrine. And it's not that either, Judge, because the collateral order doctrine has to apply categorically to an entire class of cases. And this doesn't apply categorically because what they're trying to say is that the grant of these protections must be appealable immediately in every instance. And what you have then there is you're basically making any order entered under James v. Jacobson immediately appealable. We already know from James v. Jacobson that the denial of anonymity is immediately appealable. There is no case that this court has written that says the other way around. They're not appealing a pseudonym. That's not what they're appealing. They're appealing a prior restraint. I understand you disagree, but hypothetically, if I'm right that it's a prior restraint, just accept that, then they've got to be able to appeal it, right? That's not the argument they made in their brief, Judge. What they argued in their brief was collateral order doctrine because of James v. Jacobson. That's what they said. This is back to the injunction point, right? If it's a prior restraint, then it is an injunction or the denial of vacating an injunction. Can I ask a question? We disagree on the premise. Totally fine. Can I just ask one question, which I could probably figure out but I was curious about? What's going on in the Commonwealth Court? Where is that? And is there some hope of that sort of providing broader guidance to the parties here? Your Honor, the case was decided, the custody battle was argued at the Supreme Court of Virginia in February, and the parties are waiting on a decision, and that goes to the lawfulness of the underlying adoption order. I don't think that the outcome of that is necessarily going to provide particular guidance. Not here, but maybe to Judge Luke. Potentially, but I think it remains to be seen. Can I follow up on Judge Richardson's question? Assume again that this is a prior restraint, and I know you dispute that, and might be, would be appealable. So when would the appeal have to have been taken in this case, if that were the case? I think when the restraint was put into place. And so the appeal is nonetheless untimely, right? Correct. So then what's their, then the alternative remedy is mandamus, and tell me why that wouldn't apply here. Well, I think then we get, if we're through all of that, and at the, assume everything we've talked about for the last 15 minutes, I think then we're talking about whether it survives strict scrutiny. And we think it does survive strict scrutiny. I don't think there's any meaningful dispute that there is a compelling. Actually, the question I'm asking is whether we should issue the writ in this circumstance. And I guess maybe we have to look at the merits, right? So that's your point. I think that's right. I mean, I think the point I will credit my friend Mr. Moran with in the briefing on the motion to dismiss is when you get around to talking about what is mandamus jurisdiction, it's kind of hard to talk about mandamus jurisdiction in a vacuum separate from the merits of what you're seeking. And so I do think at that point you more or less are looking at the merits of that First Amendment issue. But again, I don't think there's a meaningful dispute to there being a compelling interest here. Again, the factual findings of that, the same factual findings that underlie the pseudonymity order also underlie the compelling interest in, if you're going to call it a prior restraint, making sure that the does are not identified publicly. And, you know, Judge Moon said that it is anything but speculative that the, that revealing the identities of the does publicly would pose a substantial risk of harm to innocent non-parties. As far as the narrow tailoring goes, again, we're talking only about the limited restriction on identifying John and Jane Doe. It identifies information that that information is specifically connected to the identified risk of harm. And it still provides an opportunity for the mast to disclose that information through the use of the nondisclosure agreement provision. And the last thing I'll say, you've been very generous by letting me go over time, the mast say that Judge Moon impermissibly shifted the burden to them. I would ask the Court to look again at footnote 12 where Judge Moon did his alternative strict scrutiny holding. He actually found, he said, I find that these are not only narrowly tailored to serve their intended purpose, but constitute the least restrictive means to ensure plaintiff's safety and that of their families still in Afghanistan. That finding comes first in the footnote. Following that footnote, he then points out that notwithstanding his finding on that, the mast didn't bring him anything else to suggest that there was something else on the other side of that. There's no, to use the phrasing from the Martinez or the Ramirez-Ralupa case that they cite about strict scrutiny, there's no obvious alternatives for purposes of serving that compelling interest. All right. Thank you, Mr. Elker. Thank you very much. We think the fundamental distinction between a protective order and a gag order is that a protective order at most applies to the judicial process itself, or to out-of-court statements that are related to the judicial process. For example, because they contain information that was only learned there. In fact, Murphy Brown shows that that at most is an outer limit, because there the order did in fact cover information that was learned during the course of the judicial process, and yet the court nevertheless treated it as a gag order. I actually think the trade secret example is a very helpful one and one that I'd like to return to, and I think it also helps explain the Seattle Times issue. If a trade secret plaintiff wants to come in and not just get a protective order for discovery, Judge Richardson, to your point, to say, we're willing to produce some documents about our trade secrets, but we want to do it under a protective order. If they want to come in and say, we need you, court, to order the defendant to stop using our trade secrets now, before the case is decided, they don't do that by seeking a protective order under Rule 26. They do that by seeking a preliminary injunction and running the gauntlet of the winner factors and showing that they have a likelihood of success on the merits. If Rule 26 really were broad enough to say that it could justify an out-of-court injunction that restricted the out-of-court statements that were not based on the judicial process, then it would violate the Rules Enabling Act because it would create a substantive right for a plaintiff to come into court and restrict their adversary's speech that Congress never enacted and that would be a creature solely of the rules. Of course, we don't think Rule 26 does violate the Rules Enabling Act precisely because it doesn't stretch that far. My friend on the other side, and I do say that sincerely, my friend on the other side, said that this is not Murphy-Brown because the restriction is narrow. And I think, one, this brings to mind the vagueness challenge that we've made. I mean, there is a serious problem here with the vagueness of the directive not to indirectly identify the plaintiffs. And I think the instances in which the plaintiffs sought and the court addressed contempt are very instructive there. Now, to be clear, as we explained in the briefs, we are not currently appealing those contempt orders. There was a contempt finding on one of them. There was no sanction entered, and so we acknowledge that that part of the order is not appealable at this time. But we do think they're instructive and something the court can take notice of in construing the scope of the order. And Mr. Alker gave the example that, you know, what we're trying to do here is go out on the courtroom steps and undermine the pseudonymity by disclosing the names of the plaintiffs. That's not what we're here trying to do, even though we recognize that the logical implication of our opinion is that our clients would have the right to do that. Let's look instead at what plaintiffs have actually used this order to do, the two times that they went to the court and sought contempt. The first is one is for a media interview, when our clients went and told their side of the story, just the way that plaintiffs themselves had done. And that was they didn't like that, and so they went to the court to seek contempt under this ex parte protective order. And the second time was when our clients attempted to raise money to fund their legal defense, and they didn't like that either, and so they went. When you say ex parte protective order, you're talking about the one from 2022. Yes. That's what you're referring to. Yes, Your Honor. And you say this order you're talking about. Yes, Your Honor. 22, you're talking. Correct. The September 2022 order, and I appreciate Mr. Alker's clarification of the timing. I did misspeak that we had been, the sequence is filing, service, entering of the protective order, appearance. And so I didn't mean to misstate that. Can you respond to your colleague's argument that once you fail to appeal the initial order, which I'll call a prior restraint, that you forgo any opportunity to ever appeal it again? Are there other contexts in which we've held that if you don't appeal originally that any subsequent order, you're barred from appealing? I mean, that seems like an odd rule. In the intervention motion context, we don't. We adopt the opposite rule of that. That seems like an odd rule to adopt, and I don't know what the authority for it is, but can you respond to that? Yes, Your Honor. I know they cite one case involving an FTC order that involves an argument that essentially the second order kind of merges back into the first order and therefore isn't independently appealable, but we don't think that applies here for the reasons we explained. And, in fact, Congress, I realize I'm running out of time here, but Congress said just the opposite in 28 U.S.C. 1292a1, which is to say if you are subjected to any injunction, whether it's a prior restraint on your speech or any other injunction, you not only have a right to appeal that at the time that the injunction is entered, but if at a later time the court refuses to lift or modify the injunction, then you have a new opportunity to go. Now, I reckon — If you read that as saying you only get one bite, that part of modifying or lifting the injunction is superfluous because you could never get that done. Absolutely. Well, it actually says modifying. You're exactly right. It's issuing — 1291a1 says modifying. It covers you. It's just a modification. Yes, Your Honor. What we sought — Mr. Ehrlichman said it's not a modification of what you — Well, it also requires the refusal. It also covers the refusal as well. And so that's what we sought and we were refused. Refusing means the court won't issue the injunction. We don't have that here. Yes, Your Honor. I've always understood 1292a1 to include the refusal to modify or lift an injunction after it's entered. What the courts have done is say we want to police the abuse of that. And so if a litigant is coming back every six months and trying again to say, well, will you lift the injunction now? that there are doctrines in place to limit that. But if a party comes a few months after an injunction is ordered and said, Your Honor, the key facts on which this injunction were premised have fundamentally changed and we think it deserves to be lifted, and the court says, no, we disagree, we believe that is appealable under 1292a1. A protective order is an injunction. And so this one is appealable in 2024 as having been modified. Yes, Your Honor. That's the approach the Second Circuit has taken by saying that to the extent a protective order, not any protective order, but to the extent a protective order restricts the out-of-court statements by a litigant. But the fact that you interposed so many alternatives indicates you didn't have a lot of confidence in it. Well, Mayor, it's also, as you said, it's also a collateral order appeal and it's a petition for a writ of mandamus. At least those two things. Well, Your Honor, what the Sixth Circuit, what the Sixth Circuit said. I mean, that's good law you're on. Well, I appreciate that, Your Honor. You're right on. But the Sixth Circuit set this out in Ford. And what they said is the courts of appeals differ in which basis of jurisdiction they think is the right mechanism to review this type of case. But they all agree that it can be. Well, we normally review things after a final order, when the case is over with. That's what we say all the way through. That's what the statute says. That's what that collateral order doctrine says. Absolutely, Your Honor. And I would say 1292A1 creates a congressionally mandated exception to that. The collateral order doctrine is a judicial gloss on what it means to be a final order. And, of course, mandamus is an alternative remedy when that doesn't suit. Thank you, Your Honor. Thank you, Mr. Moran. It's fair to say that we've seen some really good lawyering here today in all the cases, and this is no exception. I also recognize the fact that both you, Mr. Elicker, and you, Mr. Moran, have taken on this very difficult, emotionally taxing, and fascinating case pro bono. And that's to your credit. So we thank you both for doing that and doing it so well and ably. We'll come down and greet you and adjourn for the morning. This court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Albert Diaz, Robert B. King, Julius N. Richardson